May it please the court, good morning, your honors. For the respondent appellant, assistant district attorney Danielle O'Boyle from the office of Melinda Katz. The district court and the defense in this case have adopted the view that trial counsel did not do any work on this case until the trial actually started. But the record shows that that is not the case. Particularly the evidence before the 440 court in this case shows that Mr. DiDio had conducted a significant investigation that he was repeatedly discussing throughout the pendency of the case with the petitioner and the petitioner's family. First if we look at the case file notes taken from Mr. DiDio's file, we see that not only was Mr. DiDio in regular contact with the petitioner and his family, but he had an investigator working on the case right away. Is the issue in this case really the quantity of work or the quality of work? I understood the concern to be look, he was presented six weeks before trial with evidence that at a minimum invited further investigation as to whether there was an alternate suspect for this homicide that was worthy of investigating, would create a theory for him to present to the jury. If that's the theory, does it matter how many times he visited with the family or how many other things he did if failing to follow up on those leads was itself unreasonable? It does matter, Your Honor, because it's not just about the, it's both about the quantity and the quality. And what's important about the investigation that's happening at the outset is that a year before the trial starts, Mr. DiDio learns, having sent his investigator, Mr. Bly, out to investigate, that the crux of the people's case is going to be Oscar Valarezo and Nadia Sierra. Certainly Mr. DiDio does not get all of the documents related to those witnesses until closer to when the trial begins, but he knows based upon the note from August of 2013 that petitioner had admitted to both Ms. Sierra and Mr. Valarezo his guilt in this case. I think that, you know, another way of putting this is, isn't the question really not, at least at the level of performance, whether he did anything at all, but whether he did investigate these particular witnesses? And for that, why shouldn't we take him at his word when he tells, when he asks for an adjournment and tells the trial judge that he hasn't looked at any of those witnesses? Your Honor, he never expressly states that he has not looked at those witnesses. Certainly there's an indication that he has not spoken to many of them, but he never expressly admits that. Didn't the district court here find factually that there was no witness invest, no interviewing of witnesses? And we would review that fact finding for clear error, right? Yes, Your Honor, but also we have to look at what the state court found here, the 440 court, and the 440 court found that Mr. Bly had done some investigation. But what's critical is if we look at those witnesses in the bulk, when we talk about the quantity of witnesses, much of what the petitioner is focusing on is these witnesses named in the DD-5s. And those witnesses did not have anything meaningful to offer from what we know. Yes, you see, I mean, so is your point really with respect to the earlier investigation just an aspect of the prejudice inquiry, meaning I think your colleagues on the other side suggest that the lack of prejudice doesn't matter when the lawyer did nothing at all and therefore it was tantamount to not having a lawyer at all. So are you mainly suggesting that that isn't so, that it wasn't that bad even if he didn't spend much time looking at these particular witnesses because that then launches the prejudice inquiry? Correct, Your Honor. Our position would be that the petitioner is incorrect in saying that this failure to investigate is fundamental and incurable. Of course, our position is that it is not a total failure to investigate, that there are meaningful steps that have been conducted here, and that to the extent there are gaps in the record, undoubtedly due to Mr. DiDio's passing before the 440 hearing, counsel's presumed to have rendered effective, performed effectively, so those inferences have to be drawn in favor of counsel and then in favor of the state court that found him effective. How strong is that presumption? Suppose all of the witnesses involved were dead or couldn't be located. Would it still be the case that we'd say, well, the petitioner can't prove prejudice because he can't show that anything, any useful information was lost? Your Honor, I think that the prejudice element would still be required there. Of course, it would be more difficult for the petitioner to make such a showing, but even there, it's not as if there is nothing known about these witnesses. There are DD-5s, there are discussions about these witnesses on the record, and both the prosecutor- But that's in a more fundamental way not this case, because quite conspicuously, those witnesses were still alive at the time of the habeas petition. They were located, they were interviewed by an investigator for the petitioner, and as far as I can see, there's no evidence whatsoever presented that any of them had anything to say that would be helpful to the defense. Yes, Your Honor, that's correct, and that's where the district court's opinion is most flawed, because it disregards the prejudice analysis, and both the district court and petitioner actually say that it was error for the 440 court to even consider that the defense did not put forth evidence from those witnesses, and absolutely the court should consider that. That goes to the very heart of the prejudice analysis. These witnesses were alive in this case, all but two were willing to speak with the defense investigator, Mr. LaSalle, yet Mr. LaSalle merely testified that he was able to locate them. So help me, I was sort of trying to puzzle through this, because it didn't sound to me like that was simply a strategic choice by the defense. It sounded as though that was a response to constraints that were imposed by the 440 court as to what would and wouldn't be acceptable. Can you tell me a little bit more about sort of that ruling and whether it essentially prevented the defendant from giving us the testimony that might support a prejudice finding? There is one indication in the record that the 440 court was not going to allow, pursuant to the people's objection, the state's objection, to allow Mr. LaSalle to testify to hearsay, but even with that ruling, if the court were not going to allow him to say what the witnesses said, surely if those witnesses had something relevant to offer, the defense could have called those witnesses to testify at the hearing. They could have even presented affidavits, something to show that either Mr. DiDio had or had not contacted them, that they were willing or not willing to testify at the time of trial, and that they had material evidence that would have been admissible. That's what's so critical about the information that's contained in those police reports, is that it is almost entirely hearsay and multiple layers of that. I mean, it's not just technically hearsay, it's word on the street is rumor has it that. Yes, those are in fact the words contained within those witness interviews, and they're shown to be unreliable not just because they're hearsay, but because when you look at the totality of those police reports and you look at the statements between them, they're really not reliable. Many of the people say not only that they heard word on the street was that Lugo did it, some say word on the street was that Andy, referring to the petitioner, did it. But some of them say they got this information from Amanda, who was not at the scene at the time, but thereafter, and was the girlfriend of someone who could have been there. Well, when you look at the interview of Amanda, she says the last person that she saw the victim alive with was the petitioner. So all of that casts doubt onto the veracity. I can't be, tell me if this is the state's position, that if there's evidence in the files, in the record, of an alternative perpetrator, but in its current form, there are arguments of inadmissibility as to that evidence, that can't be a basis to conclude that the failure to investigate further wasn't a deficient performance. I mean, it seems that the potential inadmissibility of that evidence requires further investigation as to whether or not there was an alternative perpetrator, and whether there are admissible ways to put that information in front of the jury. Do we have that here? Well, Your Honor, certainly that would be relevant, but the defense still would have had to have come forward with some information that there was something more to be done here that truly would have changed the outcome. And I think that brings me to the point regarding portraying Mr. Lugo as an alternate suspect. Here, Mr. DiDio took a reasonable and persuasive strategy of discrediting the state's two key witnesses. Well, yes, that would be a strategic choice that seems to me to be at least plausible and maybe even sensible in the circumstances, if there had been a sufficient investigation to know that you wouldn't be able to do anything with the Lugo story that would do anything other than, in the jury's mind, kind of shift the burden of proof to the defense. But if you haven't done the homework, it can't be a strategic choice, or it could be a strategic choice, but it's a strategic choice made in ignorance of what it was the lawyer's duty to know. But the defense in this case, Your Honor, did not meet the burden to show that Mr. DiDio did not do his homework, that he did not pursue that lead. And that's why we do need to look at the representation as a whole, what he had done before, the fact that he is having conversations with his client, and we don't know what's happening during those conversations. His notes reflect the month or two before trial that he is reviewing the paperwork related to Mr. Lugo, that he notes that he is a potential suspect. Undoubtedly, that was explored as a potential strategy. But here, from what we do know in the record... Undoubtedly, that was explored as a potential strategy. Where are you getting that from in the record? We've got a living second chair who was very clear that that wasn't explored as a strategy. Well, let me rephrase, Your Honor. Not explored as a strategy to actually implement a trial, but that it was considered and perhaps discussed, because he notes before the trial starts, two months before, when he gets that first batch of police reports, that Lugo is a possible suspect. There's a note that says Lugo. Yes, and it says Lugo... It doesn't tell us very much. No, of course. But those gaps in the record, that's where the district court erred in taking every inference against Mr. DiDio and against the state court. So here, we have an indication that he is aware of Mr. Lugo as a possible suspect. Do we know the full extent of his investigation into that? No. But from the evidence that we have on the record, we can also see that there's good reason to avoid that strategy. And even though the district court said, well, he could have added this into his strategy, that's also problematic. Well, unless folks want to keep going, we're going to get to hear from you again on rebuttal. So why don't we hear from Attorney Consular, and then we'll pick up where we left off. Thank you, Your Honors. Thank you, Your Honors. May it please the court, my name is Sarah Consular, and I represent the appellee, Andrew Caballero. Your Honors, the case against my client was undeniably weak. There was no physical evidence, no eyewitness, no credible motive. The state's case was old. He was convicted nearly 20 years after the victim's murder. Counsel, I struggle a little with the basic premise that it's weak. All of the things you just said are true. And you have two witnesses, two independent witnesses, who know the defendant, who were unquestionably present the night of the murder, who independently testified that they saw the defendant covered in blood, and independently testified that they each heard the defendant admit to the murder, and one of whom testifies that he's present at the beginning of, at least, of the fight. That just doesn't strike me as weak, and obviously that's the premise of the district court's prejudice decision, so help me with that. Well, ultimately, it's a credibility contest between two witnesses who present testimony that at times is wildly inconsistent, and if you look at the district court's... Which we know because Mr. DiDio effectively cross-examined both witnesses and brought out all of those weaknesses, except for the somewhat unfortunate incident about the stairway. It's a pretty good job of knocking the holes. Nothing that you said about those witnesses was not before the jury, and that was because Mr. DiDio brought that all out in cross-examination. Yes, and when you start with a case that is a credibility contest, it's important to conduct an investigation, because this is a case where reasonable doubt was within Mr. DiDio's reach. That's a deficient performance point, not a prejudice. If only he had done his job. Well, the weakness of the case goes to prejudice of that deficient performance, right? The fact that it was just a creditability contest between two witnesses, the fact that there was no corroborating evidence, the fact that we have two witnesses that testify that somebody comes out of an elevator covered in blood, and yes, there's no blood in that elevator. The fact that somebody would come down in an elevator and not be seen in a large apartment building covered in blood with no physical evidence and no other evidence at all, right? That is the case in totality, and when you have a case that- Sorry, let's assume we agree with you, that it was wildly deficient performance not to at least follow up on these leads to see where they took counsel, and that it was a not particularly strong case because of these weaknesses that you identified. Where I'm struggling is I think you still have to be able to show that had counsel done that investigation, there's a reasonable possibility that it would have changed the outcome. To do that, don't you have to be able to come in and say, this witness, this competent witness would give information that would bolster the theory that Lugo did it, or even that we would have learned this fact that would have strengthened the cross-examination? There has to be something from that, and that's where I'm struggling. Well, yes, in a failure to call case, and that is what's found in failure to call cases, but not what's found in failure to investigate cases. As this court found in Schultz v. Marshall in a case similar to this one in that it had no physical evidence, this court found that the New York Court of Appeals unreasonably applied Strickland by holding that trial court's failure to interview one of two witnesses was not deficient. It wasn't, in that case, it was not required to then figure out what that witness would have brought to the case. It was someone who was purportedly, or that counsel believed, was an alibi witness, and this court found, reversed the court of appeals on the basis of the failure to investigate someone that counsel believed. If somebody is presented to the lawyer as, here's my alibi, right? Meaning, this is a person who can say where I was, and the lawyer does not even go out and talk to that person knowing that that is the representation that's been made. Here, what we have are witnesses who aren't witnesses. They're people who, as best anyone knows, based on the police investigation that was disclosed to defense counsel, are purveying the word on the street. Now, in that situation, it seems to me that's not very much of anything. Now, that doesn't mean that the lawyer wasn't deficient in not following up, but it's all these years later now. We've had a competent investigation. We've had an investigator interview those people, and nothing is said about what they said that suggests that they would have said anything that either was admissible and helpful to the defense, or even would be a further lead. I heard this from X, who said he was there. Even that would suggest that, well, if you had followed up, then you would have interviewed X after that. But here, not only at the 440 hearing, but in the district court where I take it there was no constraint on offering evidence of that sort, there is not word one. Why are we not constrained to infer that there is nothing that at least those witnesses who were located, who are the bulk of people in question, would have said? Well, what we have is DD-5s, right? DD-5s are no substitute for a fulsome interview of a witness, right? What the trial court says... But that's not my question. My question is, there was a presumably full interview of the witnesses now in connection with the habeas applications. What came of that? The answer seems to be nothing of use. Well, what... Respectfully, this is the analysis that the 440 court got wrong here, which is focusing on what those witnesses would have said, which is really not... Well, I think you better explain... Whether it led to admissible testimony is not the relevant inquiry. I think you better tell me why that is wrong, because I got it that way. It's not just the 440 court. So please tell me why, other than Schultz, which I think is distinguishable, there is... That is not what we should conclude. Well, here we have a number of witnesses who identify another suspect, who identify a fight with another suspect that took place within an hour before this murder took place, and who was allegedly dealing drugs with the victim, right? This information was known... This was a cold case at the time. It was a 17-year-old case, right? At the time that our investigator went out, this is now a 30-year-old case, right? The prejudice of time doesn't go to my client, right? And what the... It was incumbent, based on the information in those DD-5s, to follow those leads. Those leads could have led to... What's incumbent is a different question. I'm trying to understand what is the evidence that had the lawyer done what was incumbent, it would have made any difference to the case. I mean, you say they said there was a fight. Wasn't that known to the jury? The jury knew that there was a guy named Lugo and there was a fight. That's all they knew. That's all they knew. So the question is, what more than that did we discover when the investigation that Mr. DiDio culpably failed to do? Once that was done, what is the evidence that that investigation was fruitful? Well, if you're looking at... Excuse me, Your Honor. If you're looking at the prejudice prong here, what's required... What Judge Corman looked at in determining prejudice here is that the failure to investigate fundamentally left DiDio unable to effectively challenge the credibility of Sierra and Valorizo such that it moved the needle in this case. Ultimately, the jury was left with no reason for why Valorizo and Sierra would have lied, right? That was the closing argument of the prosecutor here. What motivation did these two witnesses have to lie? And what Judge Corman found is that an investigation of other witnesses reasonably could have led to that, and that trial counsels... Furthermore, trial counsels' failure to understand the layout of the crime scene, if he'd understood it, he wouldn't have raised some precious cross-examination time, which culminated in an angry outburst and loss of credibility, right? And then, you know, what the Supreme Court looks at, has asked this court to do in looking at prejudice in these situations, is to look at the overall weakness of the case and, you know, how strong was the case? Here, the case was a credibility contest. That factors into what is necessary to determine prejudice. But you're still typically, when you're weighing prejudice, you look at how strong the case is, and then you look at, like, the thing that should have happened but didn't, and you try to figure out whether that would have reasonably changed the outcome. And what I feel like is missing is what is that thing that would have happened if he'd done the proper investigation, so that we can figure out whether that would have been enough to reasonably call into question the outcome of the case. And what I hear you quoting from the district court's decision is, what he could have found, but could have found not based on an evidentiary presentation of some later interview that comes back and says, yeah, this is what he told me. It's a speculation of what one might find with an investigation, but then there was an investigation. Well, it's also, it's a reasonable probability standard, right? It's a reasonable probability submission sufficient to undermine confidence in the outcome. And what here Judge Corman is saying is that it's very little that would have been required, that a very little push here would have, you know, creates a reasonable probability of a different result. I also want to speak to the two alibi witnesses that we were talking about. You know, we were talking about the Schultz case, and Judge Lentz, you were distinguishing that case because here we have an alibi witness. And I submit that Judge Corman also found here that we had alibi witnesses, that the alibi witness, the alibi investigation itself was not sufficient. And Judge Corman made that determination, one, based on the representation that defense counsel made. I have not, a prior attorney went out and tried to interview these witnesses, but you know, they were uncooperative with us, right? And, but he also made it on the basis of the 440 hearing. And the 440 hearing supports that no investigation of those witnesses took place. We have Danielle Muscatello on the first day of trial ordering background investigations of these two witnesses. But these are not, these are the, I may be mistaken, but aren't the two alibi witnesses the two people who turned out to be the witnesses for the prosecution? Yes, but, but at the time he believed they were alibi witnesses. Understanding that too. So now what you're suggesting is that he should have done more investigation into these people. And what would that have led to? Because it seems to me that all the things that you're saying about the weakness of the case are precisely the result of a trial lawyer who looked into the situation and knew what to go after to discredit those witnesses. Your honor, Ed Schultz, your honors did not make that, they were, it was an alibi witness and your honors did not make the decision based on what that witness ultimately would have said. But that's not a case, excuse me, I'm sorry, that's not a case where those two alibi witnesses, purported alibi witnesses, actually testified at the trial. And before the trial, shortly before the trial, Mr. DiDio knew from the Rosario material about those witnesses that they were going to testify for the government. And that's what he thought all along. It's clear in the, all along, at least from a certain point in the investigation, it's clear that he and his investigator realized that Beloreso and Sienna were not going to help, that they wouldn't help predecessor counsel by even being interviewed. And that is a pretty good bet that those are the people we're going to see on the witness stand. And it's clear to me that if Mr. DiDio did anything in preparation for this trial, he certainly was prepared to cross-examine those witnesses about the critical things. Aren't you a jilted lover? You were up there on the roof, maybe it was you that did it. You testified inconsistently with what the other witness said to each of them. All of that came out, all of that was before the jury. So I failed to see how not looking into the alibi witnesses, this is not like, and Schultz again, a guy in the wind where, as you rightly point out, we didn't insist on what would he actually say. But that's because no one knows what he would say. No one interviewed that person. He didn't testify at trial, et cetera. So I mean, you suggested earlier, and I want to give you a chance to talk about this too, that there was, he wasn't able to show a credible motive for them to lie. So what else would he have found out by the kind of investigation he should have done that would have revealed motives to lie that didn't in fact come out at the trial? Well, Judge Corman suggests that a motivation to lie could have revolved around Michael Lugo, but we don't know because he did not investigate Michael Lugo. I mean, Michael Lugo is there waiting to be investigated, right? He's there, he's offered to defense counsel twice and no investigation takes place. What's in DiDio's notes in August of 2013- We also know what Lugo would say because Lugo voluntarily showed up and told the police his whole story. And he gave conflicting stories and he gave an alibi that was not supported by either of the two witnesses they spoke to about his alibi. So once again, what is it that would have been additional information for the lawyer here? All that stuff was known. And then if we're going to talk about is the choice not to make this a he didn't do it, the other guy did it case, which is always a very risky strategy for a defense lawyer, because once you do that, once you make a big play on that, at least in my experience, the jury starts to think, okay, have they proven that? Which really screws up your reasonable doubt defense. Well, you certainly can't make a huge play like that without an investigation. And Mr. DiDio was not in a position to do anything other than what he lamely did suggest this fight was something that might be considered. But even going back to what his notes say about the alibi witnesses, they have to be read in the context of everything else, all of the other evidence here. And what those notes say and what Judge Corman found that they meant was, at most, was that the investigator expressed a belief that these two witnesses would not testify, would not end up being alibi witnesses. It's not enough to sit there with a belief and not explore it further. In terms of the prejudice, your point would be very persuasive to me if the question was, there were two witnesses, somebody decided somewhere early on that they probably weren't going to help, but nobody actually talked to them, and we still don't know what they would say. Or better still, when a later investigator did go talk to them, it turned out they did have something to say. Here, we know for a fact what they had to say, because they said it under oath on the witness stand, and it was not an alibi. It was the very evidence that the prosecution relied on. So again, I'm just having trouble understanding where the alibi theory goes. Well, in terms of a performance analysis, based on what he knew, there were steps he should have taken. Based on a prejudice analysis, I submit your honors have to look at the weakness of the question. In terms of the representations that Mr. DiDio made about what he did, I submit they're quite clear that he hadn't done it. And my adversary says it's not what he says. He doesn't say he didn't conduct an investigation. But if you look, he's saying at the very end, when he's denied the adjournment, he pleads for witness contact information in order to conduct an investigation, so at least he won't have to start at ground zero. He's like, make them tell me where these witnesses live so I can find them. That is not the statement of somebody who's conducted an investigation, and it couldn't be clearer than that. And the other piece here that hasn't been mentioned is during the pendency of our habeas petition, Judge Corman directed the people, the appellant, to go out and get a statement, to get an affidavit from Mr. DiDio about what he accomplished, in answer to these claims. And I ask you to look at that affidavit submitted from Mr. DiDio, because he doesn't say, I conducted an investigation. All right, but I think we need to wrap it up. Thank you. Thank you. Appreciate it very, very much. We kept you up here a long time, and we'll hear from Attorney O'Boyle. Thank you, Your Honor. Just a few brief points. First, the petitioner says the 440 Court got it wrong in considering what the witnesses would have said. That cannot be true. There is no clearly established Supreme Court precedent that says prejudice should be disregarded under these circumstances. So even if we put the allegedly deficient performance aside, the petitioner cannot get around that, and the district court was undoubtedly wrong in saying that the 440 Court erred in considering prejudice. That the petitioner at no point in the pre-hearing submissions, at the hearing, in the post-hearing submissions, in the habeas papers, could come forward with anything from what these witnesses could have testified to. The fact that that did not happen shows that they cannot meet the prejudice prong, and to say that the 440 Court got it wrong in considering that, that just cannot be. Just to briefly address the alibi witness issue, as Justice Lynch mentioned earlier, this is not the case where these are true alibi witnesses, and I think it's important to note that Mr. DiDio knew from the outset of this case, from a year before, that they would not be alibi witnesses for him. So he spends presumably much of his investigation and certainly his time at trial discrediting those witnesses. That was a reasonable strategy. He does it effectively. He's able to elicit meaningful inconsistencies, not only between Mr. Valarezo and Ms. Sierra, but between their own statements that they've made previously. And he's able to throw Mr. Lugo out there as a possible suspect. The fact that he, Mr. Lugo, was described as having exploded, leaving the scene. He's able to give the jury enough without going down that path of what Justice Lynch mentions, of creating that dangerous situation where you're out of the realm of just proving, trying to disprove the case beyond a reasonable doubt, and taking on an affirmative burden in a practical sense of trying to say, it's this other person, against whom there's no evidence, who is then pinned up against the defendant, who is seen emerging from the elevator, covered in blood, and admits his guilt separately to two witnesses. So the honors have no further questions. We'll rely on our brief. Thank you. Appreciate it. Thank you both. Appreciate your arguments. We will take this under advisement.